ESTATE OF LUCIE BESAG, CROCKER NATIONAL BANK, A NATIONAL BANKING ASSOCIATION, AND LEON J. ALEXANDER, CO-EXECUTORS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Besag v. Commissioner
Docket No. 1907-72.
United States Tax Court
T.C. Memo 1975-163; 1975 Tax Ct. Memo LEXIS 210; 34 T.C.M. (CCH) 737; T.C.M. (RIA) 750163; May 28, 1975, Filed Gene R. Prasse, for the petitioners. Richard H. Gannon, for the respondent. TANNENWALD
MEMORANDUM OPINION TANNENWALD, Judge: Respondent determined a deficiency of $28,286 in the income tax of petitioners' decedent for the year 1967. The only remaining issue is whether certain loans made by decedent became uncollectible during 1967, giving rise to a nonbusiness bad debt loss under section 166(d). [1]
All of the evidentiary facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. The stipulation recites that the executors "resided or had their principal place of business *211 in Los Angeles County, California" at the time the petition was filed. We take this to mean that the individual executor resided, and the corporate executor had its principal place of business, in Los Angeles County. Decedent died in 1970, before the issuance of the notice of deficiency involved in this action. Prior to June 1965, the decedent, then approximately 63 years of age, became acquainted with one Richard or Rick Byron, then approximately 32 years of age. In or about June 1965, Byron proposed that a corporation, Rick Byron, Inc., be created to operate a women's retail fashion store, to be owned and operated by Byron and featuring clothing designed by him. Decedent began loaning money to this corporation, wholly owned by Byron, in June 1965. The corporation did engage in the business as planned, operating a small store in Los Angeles. Decedent supplied all of its working capital on an "as needed" basis. She made a series of advances from June 1965 to June 1967 totaling some $33,000. The store did not do enough business to sustain itself, soon requiring the decedent to continue making loans at the rate of at least $2,000 per month to keep it in operation. In June 1967, Byron *212 decided to go into the business of manufacturing women's fashions. The retail store was closed, and manufacturing operations commenced in rented premises in the garment district of Los Angeles. Decedent increased the amounts of her loans to cover the demands of the new business. By the summer of 1967, the business required loans substantially in excess both of decedent's expectations and of the former needs of the retail store. In September 1967, she retained an accountant, Golden, to investigate the corporation's financial condition. No meaningful corporate books existed, and she wanted to discover the true capital needs of the business. Around August 1967, decedent was requested by suppliers to give a blanket guarantee to certain credit purchases by Rick Byron, Inc. Golden reviewed the proposed forms and suggested minor modifications. Pending finalization of the guarantee, decedent was billed directly. This interim guarantee was limited to $500 per order. Ultimately, decedent decided not to execute the blanket guarantee forms. Because the corporation's books had not been posted from the beginning and were effectively worthless, Golden was forced to reconstruct the corporation's *213 financial condition. In or about September 1967, and prior to the completion of his examination, he advised the decedent to contact an attorney to formalize her agreements with Byron. She did so, and in early November 1967, prior to Golden's report, decedent and the corporation entered into the following letter agreement: [2]
Dear Rick: As you know, I have advanced to Rick Byron, Inc., a corporation, the sum of $62,775.00, as of October 7, 1967. I have advanced additional sums during the month of October and have been requested to make further advances in the future. This letter is intended to set forth our understanding with each other and to determine our future course of conduct. Our agreement, therefore, is as follows: (1) All of our prior written agreements are hereby modified and superseded by this letter agreement. (2) You hereby acknowledge that the corporation is indebted to me in the sum of $62,775.00, as of October 7, 1967. You further acknowledge that I have made additional advances to the date hereof. On my part, I agree to advance sums needed for the operations of the corporation to and including December 31, 1967, in an amount not to exceed $5,000.00 per month. *214 I have made [sic] and do not now make any commitment to advance any sums after that date. (3) You agree that the corporation will repay to me, without interest, all of the funds I have heretofore advanced or may hereafter advance. Such repayment is to be made out of and from 10% of the gross receipts of the corporation. I am to be kept advised currently of all activities and receipts of the corporation and given full and complete statements and reports. My share of the gross receipts are [sic] to be paid to me quarterly, commencing January 1, 1968, until paid in full. (4) In the event that further sums are required after January 1, 1968, I have no obligation whatsoever to advance them. Nevertheless, it is my present intention to further advance sums subsequent to January 1, 1968 in an amount equal to the gross repayments made to me prior to that time. All subsequent advances, of course, shall be added to the then outstanding balance and be repaid as the initial advances are to be repaid. (5) We acknowledge that at the present time, Rick Byron is the president of the corporation and Lucie Besag is the secretary. They are also the directors of the corporation. One office is *215 vacant. It is agreed that so long as the corporation is indebted to me, I will remain one of the two directors and that, therefore, I will be permitted to participate in each major corporate decision. (6) You have heretofor represented to me that there are only fifty shares of stock outstanding in the corporation and that they are all owned by Rick Byron individually. For and in consideration of the advances of money I have heretofor made to you, you have and do hereby give me the right, privilege and option to buy seventeen shares of stock of the said corporation at and for the price of $1.00 per share. This option shall be valid and subsisting until thirty days after the corporation has repaid to me all of its outstanding indebtedness. (7) Please sign a copy of this letter as our agreement. /s/ Lucie Besag LUCIE BESAG At the end of November 1967, Golden delivered his report to decedent but only with respect to the period ending September 30, 1967. He advised her that the business was "totally insolvent"; that, although he could not yet prepare an accurate *216 financial statement, it had liabilities far in excess of its assets; and that it was her periodic loans that kept the corporation afloat. He told her that additional capital would be required for several months because no substantial buyer had been found for the corporation's spring line of fashions. He also informed her that "the only reason to keep the business alive would be in the hopes that the business would enjoy success in the next selling season which was the 'fall season' in May or June * * * the next substantial season available to the company." He suggested that decedent seek repayment of her loans and cease making new ones. Following the report, decedent made only one further loan to the corporation, on December 12, 1967, in the amount of $12,500. [3] The table below summarizes the amounts which decedent advanced to Rick Byron, Inc., totaling $92,503. Month
1965
1966
1967
Jan.
$2,500
Feb.
$ 2,500
2,000
Mar.
2,000
3,300
Apr.
2,000
2,150
May
2,000
2,000
June
$1,000
2,000
5,500 [4]
July
175
2,000
5,750
Aug.
2,500
2,700
Sept.
2,000
4,000
Oct.
2,250
6,837
Nov.
500
3,000
12,391 [5]
Dec.
4,200
2,750
12,500
*217 The check for the December 1967 loan bore the notation, "as final and last payment." Respondent has not contested that a valid indebtedness existed and that it had a value at some point during the taxable year. The parties have locked horns on the issue of total worthlessness at the end of the taxable year. . In order to prevail, it is incumbent upon petitioners to prove that, as of December 31, 1967, there was no reasonable possibility that all or part of the amount owed could have been collected by diligent effort. The burden of proof is upon them. . Our determination of the worthlessness issue must be made on the basis of all the facts and circumstances. . *218 Petitioners lay great stress on the evidence which, they assert, demonstrates that Rick Byron, Inc., was "totally insolvent"by the end of 1967. Their conclusion is based primarily on the statement by the accountant, Golden, of the conclusions he reported to decedent in November 1967. It may be that the corporation was in difficult economic straits. However, petitioners have not introduced evidence of any of the underlying facts that would support or explain Golden's conclusions or his statement that liabilities far exceeded assets. Assuming without deciding that Rick Byron, Inc., was insolvent, this fact would not in and of itself establish the total worthlessness of the idebtedness. . Decedent made no effort at collection and, on the record before us, we cannot conclude that such effort would have been futile in respect of the total indebtedness. Even an insolvent debtor is likely to have some assets out of which a distribution to creditors can be made. Nothing in Golden's statement shows that the corporation had zero or nominal assets or that there existed creditors prior in right to decedent whose claims would exhaust *219 what assets there were. [6]. It is stipulated that decedent advanced sizeable amounts of cash to the corporation in the last three months of the year, subsequent to the closing date of Golden's report. We cannot assume that these funds were entirely dissipated before the end of the year or were not used to acquire other assets, such as inventory, with realizable value. Moreover, in ascertaining total worthlessness, the potential ability to pay has a bearing and we have no evidence that such potential did not exist herein. , affd. (C.A. 3, 1958). The detailed arrangement, providing for additional loans and for payment out of the corporation's gross receipts, made in November 1967, contains clear indications of an expectation that Rick Byron, Inc., would turn around in 1968 and provides a basis for concluding that *220 repayment could be anticipated. Additionally, the $12,500 advance made, on December 12, 1967, after Golden's gloomy report, falls within the ambit of the judicially articulated guideline that "[where] a creditor voluntarily advances further large sums to a debtor * * *, [she] can hardly assert the worthlessness of the account on which the new advances were made." . See (C.A. 6, 1969), affirming ; , affirmed on this issue, (C.A. 8, 1973); . [7] The fact that this advance was marked as "final and last payment" does no more than indicate that the flow of funds from decedent would stop; it does not negate the other indicia that the debt could have at least been partially repaid out of gross receipts before the corporation's eventual collapse.[8] See (C.A. 8, 1973). Perhaps something occurred between the time of *221 this advance and the end of the year to change the potential prospects of Rick Byron, Inc., but, if such was the case, it was incumbent on petitioners to provide evidence on this score. We conclude that, based upon the objective facts as disclosed by the record herein and the reasonable inferences to be drawn therefrom, *222 petitioners have not carried their burden of proof that the indebtedness of Rick Byron, Inc., to decedent was totally worthless by the end of 1967. To account for the parties' agreement on another issue, [9]
Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in force during the year in issue.↩
2. The letter agreement was addressed to, and executed by, Byron in his capacity as president of Rick Byron, Inc.↩
3. The figure of $12,000 appears at one point in the stipulation but is inconsistent with other stipulated facts and presumably is due to a typographical error. ↩
4. Advances prior to June 1967 are attributable to the retail business; those in June 1967 and thereafter are attributable to the manufacturing operation. ↩
5. All November advances were made prior to Golden's report.↩
6. The existence of major creditors other than decedent is cast in doubt by the stipulation that as early as August the corporation's suppliers began billing her directly or requiring her to guarantee its credit purchases.↩
7. No suggestion has been put forward that this advance should be treated as something other than a loan, thereby negating the inference to be drawn in respect of future prospects of future repayment and creating the possibility of finding that the prior indebtedness became worthless. Cf. . ↩
8. In their opening brief, petitioners ask us to take judicial notice of bankruptcy proceedings. In re Rick Byron, Inc.,↩ Case No. 45100CC, Central District of California (Oct. 31, 1968). While we may well take such notice of the fact of bankruptcy, it was incumbent upon petitioners to produce evidence, either by way of a stipulation or offer of proof at a trial, as to the substantive underpinnings of that proceeding. (C.A. 5, 1954).
9. The deductibility of certain legal fees allegedly incurred in connection with the Rick Byron, Inc., debt was raised in the petition. No evidence was introduced and no argument was made by petitioners regarding this issue, and we treat it as having been conceded.↩